Michael E. Piston
Attorney for the Plaintiffs
225 Broadway Ste 307
New York, NY 10007
Phone 646-845-9895
Fax 206-770-6350

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| **AB DISCOUNT DEPOT LLC and AHMED MANSHA** | |
| Plaintiffs, | |
| against | Case No.:   18-4383 |
| **UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES** | |
| Defendant. | COMPLAINT |

## COMPLAINT

## DESCRIPTION OF ACTION

1.  This action is brought pursuant to the Administrative Procedure Act, 5 U.S.C. § 701 *et. seq*., by plaintiffs, AB Discount Depot LLC and Ahmed Mansha, against the defendant, the United States Citizenship and Immigration Services (USCIS), asking the Court to hold unlawful and set aside the United States Citizenship and Immigration Service (USCIS or the agency)'s decision of April 19, 2018[1], granting AB Discount's motion to reconsider and to reopen the agency's decision of February 7, 2018, and denying again its Form I-140,  Petition for Alien Worker upon Ahmed Mansha's behalf  in File No. LIN 169-083-7347. Inasmuch as the record shows that the agency's decision is arbitrary and capricious, and perhaps (depending on how it is interpreted) not in accordance with law, the plaintiffs should be granted summary judgment.

## DESCRIPTION OF THE PARTIES

2.  Plaintiff AB Discount Depot LLC (AB Discount) is a New Jersey  Limited  Liability Company.

3.  The plaintiff Ahmed Mansha is a citizen of Pakistan, lawfully in the U.S. as a "treaty investor" pursuant to 8 U.S.C. § 1101(a)(15)(E) and residing in Nassau County, New York.

4.  The defendant United States Citizenship and Immigration Services is an agency within the Department of Homeland Security with, among other things, responsibility for the

---

[1] This is the final decision in this matter and the one of which the plaintiffs seek  review by this Court.

adjudication of Forms I-140, Petition for Alien Worker, filed by U.S. employers to qualify certain of their employees for immigration to the United States. It is based in the District of Columbia.

## JURISDICTION

5.  This being a civil action against the United States arising under the Immigration and Nationality Act, 8 U.S.C. § 1101 et. seq., and the Administrative Procedure Act, 5 U.S.C. § 701 et seq., both laws of the United States, original jurisdiction over this matter is vested in this Court by 28 U.S.C. § 1331.

## VENUE

6.  This Court has venue over this matter under 28 U.S.C. § 1391(e)(1)(C) in that plaintiff Ahmed Mansha resides in Nassau County, New York, which is within the judicial district of this Court.

## BRIEF NARRATIVE OF PERTINENT FACTS

7.  The petitioner, AB Discount, is a retailer of low cost consumer products which has recently acquired as a wholly owned subsidiary a marketing company, Mansha, Inc. These two entities will work closely with Shami Textiles, a Pakistan based manufacturer of clothing, to expand Shami's highly successful clothing products to the American consumer, both directly through AB Discount Depot's retail outlet and through other clothing retailers throughout the United States. Exhibit 1 at 3. AB Discount is 51% owned by Mansha Ahmed, the beneficiary of its Form I-140. Exhibit 4 at 5. Mr. Ahmed is also a 50% owner and Managing Director of Shami  Textiles.  Exhibit 4 at 8. Mr.

Mansha is "in charge" of Shami Textiles, subject only to his partner's veto. Exhibit 11 at

8. In its letter in support of the petition, AB Discount indicated that it wish to employ

Mr. Mansha as the Managing Member of its own organization performing the following

duties:

For an estimated 56% of his time as Managing Member of AB Discount Depot LLC he will oversee and work with the General Manager of AB Depot Discount Depot to completely review the operation of the company from the bottom up to determine how it can be run more efficiently. In performing each of these duties the Managing Member will oversee the action of the general manager in the sense that he will look to the general manager to be bis resource in providing him the information needed to be able to perform the above tasks as well as providing the first draft of reports on each of these subjects, to which the Managing Member would make the final revisions and give final approval.

This will involve each of the following:

1. Reviewing the sales history for each of the products stocked by AB Discount Depot to determine which should be retained, which should be the subject of price negotiations, and which should be dropped. 5%

2. Determining how to best use AB Discount Depot as an outlet for clothing manufactured by Shami Textiles under its own label. 5%.

3. Review the possibility of adding additional products by obtaining lists of available products from suppliers and working with the general managers to determine the pros and cons of each product. 5%

4. Review the entire layout of the store to determine how it can be redesigned to maximize workflow efficiency and encourage sales. 5%

5. Obtaining and reviewing bids from contractors to effect the redesign once decided upon.

   3%

6. Reviewing the performance of each supplier to determine whether they are well suited to continue to work with the company. 5%

4

. Soliciting proposals from other suppliers to give provide products to the company 3%

8. Reviewing the work history of each employee with an eye towards their appropriate compensation, as well as to determine whether they should be promoted and/or terminated. 5%

9. Interviewing and hiring additional employees 5%

10. Preparing employee manuals to make clear the company's expectations of each employee and what they should expect from the company. 5%

11. Preparing a 5 year plan for the company's expansion, including the development of new locations. 5%

12. Analyze financial statements, sales reports, and other performance indicators to determine trends and plan how to optimize the company's future performance 5%

Meeting and discussing with the general manager and troubleshooting day to day problems such as employee disciplinary problems, minimization of product shrinkage, and significant purchases, any action pertaining to which must be approved by the Managing Member after having received a full report and recommendation by the general manager; 10%

• Meeting with the company's suppliers to discuss concerns which may arise out of the review discussed above, and renegotiate supply agreements as necessary. 5%

An estimated 25% of the time of Managing Member of AB Discount Depot LLC he will oversee and work with the General Manager of Marisha, Inc., AB Discount Depot's marketing subsidiary,[11] to completely review the operation of the company from the bottom up to determine how it can be operated to be better facilitate the sales of Shami Textile products in the U.S. This will include

5

1. Reviewing a complete list of all known large outlets of casual clothing in the U.S. to determine which should be approached regarding distributing Shami Textiles products and the best approach for doing so. 5%

2. Reviewing in detail the performance of each Marisha, Inc. employee with an eye towards their appropriate compensation, as well as to determine whether they should be promoted and/or terminated. 5%

3. Interviewing and hiring additional employees 5%

4. Reviewing with the general manager day to day problems and they arise and trouble shooting 5%

5. Negotiating agreements to supply Shamsi Textile products to new distributors. 5%

Working with the company's CPA to organize both AB Discount Deport and Mansha Inc.'s affairs in such a way as to minimize taxation and the avoidance of unnecessary penalties. (4%)

**The duties of the supervisory personnel supervised by Mr. Ahmed:**

A. *Mohammed Baig, General Manager of AB Discount Depot, LLC*

As the General of AB Discount, Mr. Baig supervises the day to day to work activities of the store and the following employees in the indicated tasks as well as ordering, price negotiation, writing the hours to send to the accounant and distribute checks

Tahir Quershi, Store Manager, responsible for groceries, automotive products

Farida Babar, Cashier

Salfo Cornpadre, Responsible for cleaning supplies health and beauty

Doodnauth Dhari, Responsible for Floor Cleaning, Window Cleaning, Shelf Cleaning Maintenance.

Huzaifa Baig, General Labor

  B.   *Mazalier Shah, Marketing Manager of Mansha. inc.*

Talah  Furrakh **–** Sales Yasrab  Akram  **–** Sales

Exhibit 2 at 2-5.

9. The petition also included a letter from Ahmed Faraz, Mr. Mansha's partner in Shami

Textiles, Exhibit 4 at 1[2], in which he indicated that while employed at Shami Textiles since 2002

Mr. Mansha performed the following duties as its Managing Director:

> The Managing Director has both managerial duties related to overseeing department
> managers and also direct-contact duties related to negotiations with buyers and outside
> vendors. The Managing Director spends significant time managing other managers and
> supervisors.
>
> 30% supervising the general manager
> 20% supervising the printing manager
> 30% supervising the finance manager
> 10% supervising the administration manager
> 5% supervising the construction manager
> 5% negotiating with buyers about price and quality

Mr. Faraz also described the duties of the persons the Managing Director of Shami

Textiles oversaw and how he supervised them:

> Supervision Duties:
>
> **General Manager**: The GM oversees several departments at the factory: QA,
> Production, PPC,  Merchandise, Cutting, and Printing and EMS. Each department has its
> own manager. The GM  oversees these managers. The Managing Director oversees the
> work of the GM. The Managing Director and the GM meet daily to discuss the previous
> day's work, addressing issues that are ongoing or new, reviewing quantity of product
> produced, dealing with machine maintenance, production schedules as they related to
> shipment dates, and exploring the possibility of hiring temporary workers.
>
> **Printing Manager**: The Managing Director meets daily with the Printing Manager to
> discuss issues regarding production. The topics include shipment dates, general
> production issues, creating, reviewing and analyzing samples new products to determine
> the feasibility of profitably mass producing them, and progress regarding new customers
> and quality control. They also discuss efforts to find new products, new inks, and
> generally how to both increase the quality and reduce costs. The Managing Director and

---

[2] In this document his name is misspelled as Ahmed Franz.

Printing Manager coordinate how best to communicate with buyers, particularly if issues arise regarding price and/or quality. The Managing Director oversees the Printing Manager's interactions with buyers. The Managing Director also oversees the Printing Manager's progress if redo's are required after rejections from buyers. The meetings also focus on trouble-shooting in general and understanding why product was sent back.

**Finance Manager:** The Managing Director and the Finance Manager meet daily about expenses owed to suppliers and payments due from buyers. They also set dates of payments. In addition, they discuss how best to manage the company's overall finances, specifically as they relate to cash-flow needs. They discuss possible loans and the overall relationship with banks.

**Administrative Manager:** The Administrative Manager has responsibilities similar to that of Human Resource Directors, as well as looking after "compliance issues", specifically certification requirements imposed by foreign purchasers. This involves certification from international organizations confirming that Shamsi Textiles is complying with international safety, labor, and quality standards, such as the requirement that it maintain a certain number of fire extinguishers and specific regulations regarding how goods are packed. Also, it is required by buyers to be certified by the Custom-Trade Partnership Against Terrorismand Worldwide Responsible Credited Production. To this end, daily meetings are held between the Managing Director and the Administrative Manager. They also discuss attendance issues, firing and hiring.

**Construction Manager/Contractor:** The Managing Director meets with the manager in charge of construction about twice a week. This is an independent contractor, not an employee. The Construction Manager supervises at varying times anywhere between l0 and 50 workers involved in expanding and upgrading Shamsi Textiles' factory. These meetings include general progress reports and discussions about financing and troubleshooting problem arising in this work.

**Direct Contact Duties:**
Negotiation with buyers about price and quality.

Exhibit 4 at 217-218.

11. An organizational chart submitted with the petition demonstrated that the managers supervised by Mr. Mansha in turn supervised at least five managers themselves. Exhibit 4 at 220. In fact, as of February 16, 2017 Shami Textiles had 242 employees. Exhibit 7 at 36-37. AB Discount and its subsidiary counted 10 employees at the time of filing of the petition, Exhibit 2 at 5, as well as a gross annual income in excess of $500,000. Exhibit 1 at 3 and Exhibit 4 at 259.

12. In response to this petition the USCIS issued a request for additional evidence on September 12, 2017, Exhibit 5, to which AB Discount filed a response which included AB Discount's Share Certificates and Register, Shami Textiles' Garment Manufacturing Association Membership 2014-2018, Shami Textiles' Purchase Invoices 2015 to 2017, Shami Textiles' Tax Return, Shami Textiles' Payroll Summary, Shami Textiles' Evidence of International Trade, Shami Textiles' 2014 Partnership Deed, Sworn Statement of Ahmed Mansha, AB Discount's Tax Documents, and Evidence of the Ownership of AB Discount Depot LLC. Exhibits 6 & 7. The Statement of Ahmed Mansha elaborated upon his duties at Shami Textiles and his proposed duties at AB Discount as follows:

> For an estimated 56% of my time as Managing Member of AB Discount Depot LLC I will oversee withthe General Manager of AB Depot Discount Depot to review the operation of the company from the bottom up to determine how it can be run more efficiently. In performing each of these duties I will oversee the action of the general manager in the sense that I will look to the general manager to be my resource in providing me with the information needed to be able to perform the above tasks as well as providing the first draft of reports on each of these subjects, towhich the Managing Member would make the final revisions and give final approval. This will involve each of the following:
> 1. Reviewing the sales history for each of the products stocked by AB Discount Depot to determine which should be retained, which should be the subject of price negotiations, and which should be dropped. 5%. Example: hired employee to properly record and a spreadsheet be made to analyze the quantity and price of most popular products.
> 2. Determining how to best use AB Discount Depot as an outlet for clothing manufactured by
> Shami Textiles under its own label. 5%. Example: Decided to make space for adding low priced garments by eliminating products which were not as profitable.
> 3.Review the possibility of adding additional products by obtaining lists of available products from suppliers and working with the general managers to determine the pros and cons of each product. 5%. Example: Decided to increase the variety of furniture and Home Goods products.
> 4.Review the entire layout of the store to determine how it can be redesigned to maximize worktlow efficiency and encourage sales. 5%. Example: Decided to narrow down aisles and add stalls which can hold more products to use space efficiently. Decided to add offices for manager and employees so they can have meetings with suppliers.
> 5. Obtaining and reviewing bids from contractors to effect the redesign once decided upon.
> 3%. Example: Negotiated with security company to increase security of store and install a better Point of Sale system, Cameras and anti-theft systems.

6.Reviewing the performance of each supplier to determine whether they are well suited to
continue to work with the company. 5%. Example: Ordered to make a detailed record of suppliers and their competitors, delivery timing, product prices history, discounts they give and their age of relationship with the store.

7. Soliciting proposals from other suppliers to give provide products to the company 3%

8.Reviewing the work history of each employee with an eye towards their appropriate compensation, as well as to determine whether they should be promoted and/or terminated. 5%. Example: **Laid off one manager to reduce cost and promote an employee who could do the job better.**

9. Interviewing and hiring additional employees 5%.

10. Preparing employee manuals to make c1ear the company's expectations of each employee and what they should expect from the company. 5%

11. Preparing a 5-year plan for the company's expansion, including the development of new locations. 5%. **Example: Paid attention to an aggressive adve_rtising strategy and securing loans for rapid expansion.**

12. Analyze financial statements, sales reports, and other performance indicators to determine trends and plan how to optimize the company's future performance 5%.

For an estimated 25% of my time I will work as a Managing Member of AB Discount Depot LLC overseeing and working with the General Manager of Mansha, Inc., AB Discount Depot's marketing subsidiary," to completely review the operation of the company from the bottom up to determine how it can be operated to be better facilitate the sales of Shami Textile products in the U.S. Therefore, in performing each of these duties the General Manager will assist me in developing the strategy required below, including, for example, developing the necessary information need to develop the sand will implement strategies as developed. This will include  reviewing a complete list of all known large outlets of casual clothing in the U.S. to determine which should be approached regarding distributing Shami Textiles products and the best approach for doing so. 5%. **Example: Order that a list be compiled of all brands who have fewer than 50 stores and making strategics of approaching them.**

14. Reviewing in detail the performance of each Mansha, Inc. employee with an eye towards their appropriate compensation, as well as to determine whether they should be promoted and/or terminated. 5%

15. Interviewing and hiring additional employees 5%

16. Reviewing with the general manager day to day problems and they arise and troubleshooting 5%. **Example: A challenge will be made to provide samples to potential buyers. I will order that sample kits be made and sent out to all potential buyers at once to.**

17. Negotiating agreements to supply Shami Textile products to new distributors. 5% more efficiently. **Example: Shortlisted potential buyers after manager gave a report after the salesmen had meetings with potential buyers.**

**In addition to the time spent supervising the Managers of AB Discount Depot, LLC. andMansha, Inc. I will spend 4% of my time** working with the company's CPA to organize both AB Discount Depot and Mansha Inc.'s affairs in such a way as to minimize taxation and the avoidance of unnecessary penalties
.

The remaining 15% of my time will be spent socializing with employees, customers of AB Discount Depot LLC and Marisha Inc, and other people in the industry so as to be

able to stay informed as to developing trends and to not be completely depend upon my managers for information.

The product of AB Discount Depot, LLC. is a wide variety of inexpensive retail products, including groceries and household items. The exact productive and administrative tasks necessary to produce these products is that they need to be ordered from suppliers, removed from the suppliers' trucks when they  arrive, stacked in the backroorn and then moved from the backroom to the store shelves. The cashiers must take money and credit card payments from the customers who pay for the goods. The general manager takes the money from the cashiers at the end of the day and takes the money to the bank. I do not do any of these things.

Mansha lnc. 's service is to convince retail clothing stores to purchase the clothing and other textiles manufactured by Shami Textiles, Inc. and other Pakistani clothing manufacture for a commission. The salesmen work under the supervision of the general manager to find and approach retail clothing stores and persuade them of the quality and value of our customer's products. When interested buyers are found, the general manager will negotiate prices with them in consultation with me and subject to my approval.

I will perform all tasks related to goal-setting! policy-making and discretionary decision making, in consultation with and with the assistance of the General Managers of AB Discount Depot, LLC. and Mansha, Inc.

Exhibit 7 at 1181-1183.

13. On February 7, 2018, the USCIS issued a decision denying AB Discount's petition for the following reasons:

1.      "A qualifying relationship through common ownership of the foreign entity and the petitioner has not been established."

2. "The record does not establish that beneficiary's role with the petitioner is qualifying."

3. "The record does not establish that the beneficiary's role with the foreign entity was executive or managerial in nature."

Exhibit 8.

14. On approximately March 8, 2018, AB Discount filed a motion to reconsider and reopen the USCIS's decision. Exhibits 9 & 10. Filed with that motion was a third statement pertaining to the beneficiary's duties at AB Discount and at Shami Textiles, in which Mr.

Mansha elaborated yet again upon the duties which he did and would perform at those

companies:

1. This statement is to provide more detail regarding my job duties and
Shami Textiles and ABB Discount, Inc.
2. Shami Textiles is engaged in the sale and manufacture of garments. I am a
50% partner in this company with my brother, Ahmed Faraz.
3. Accordingly, I shared with him complete responsibility for the livelihood
of all 271 employees of the company. The complete burden of all
responsibility for keeping this company in business lay on the shoulders of
myself and the my brother.
4. Every day I spent virtually my entire day meeting with my primary
managers (the general manager, the printing manager, the administrative
manager, the finance manager and the construction manager) in my office
or on the plant floor.
5. Each day they report to me on the developments in the departments under
their control, ask my advice, make requests for additional funds, listen to
my suggestions, often arguing with me quite vigorously.
6. For example, one of the biggest issues which I met, discussed and fought
with my managers about was my desire to making structural changes in
the company's operations so as to reduce our overhead, which is now so
high it is making us uncompetitive in the international market.
7. Recently it has become much more difficult to compete in the U.S. market place due to
competition from lower cost garment makers such as Bangladesh, Mexico, Vietnam and
China.
8. In my work I have spent much time studying how garments are being manufactured in
Bangladesh, Mexico, Vietnam and China.
9. I have noticed in particular how much more efficient the garment manufacturing
business seems in those countries there when compared with our business, and how they
seem to be using the latest methods, such as lean manufacturing
10. In contrast to them our factor is still using conventional systems from 20-30 years
ago.
11. As a consequence we are very inefficient in our use of machinery. For example, we
have
about 360 sewing machines, but only 80-100 of them are actually in use.
12. Further, our factory is much too big for our volume.
13. Even worse, our managers don't even know about things like e-commerce nor e-
management.
14. We have the capacity to manufacture 300,000 garments per month (such as hooded
jackets) but instead we only produce 70000 garments per month.
15. As a consequence our prices are somewhat above comparable products in the world
market.
16. This is partly because we pay our workers more than our competitors, but most
because our workers are inefficient and unskilled, and our managers are unwilling to
learn new methods.
17. Accordingly I made many suggestions to the mentioned managers as to how we could
improve ourselves but, I am sorry to say, in doing so I faced much resistance from them
because they though my ideas were not workable.

18. In part to prove to my own managers that I was right and they were wrong I was working on creating a model unit within our factor before I left for the United States.

19. This unit would use resources more efficiently and so reduce labor and electricity costs.

20. To prove my point I instructed my general manager to do a survey to find out how many workers were assigned to one sewing machine internationally, and he concluded it was 1.75

21. Consequently, then I ask our administrative and productions managers to find out how many workers we were using per machine, and it turned out it was 3.

22. Even though only one person was actually operating the machine, we had 2 people helping the operator (such as obtaining the machine and/or supervising its use.

23. Further, many resources are being was, not just labor, but electricity and space.

24. This all arises from the failure to adopt modern world standard procedures internally.

25. Therefore I was planning to relocate people away from the stitching So there are three main departments affected which is at the cutting department the stitching department and finishing department. I wanted to relocate some employees from those two department to the cutting department.

26. To do this I knew we would need to train people, and so interview and hire trainers who can best train our workers to be more efficient.

27. I also felt that the pay structure in the factory is not good enough it's not motivating enough for the employees. So I instructed the accounting manager to look around at how people are paid in the factories surrounding our area.

28. He did this and reported that while we paid a fixed salary, most other factories pay a salary and a per piece rate.

29. Consequently I have been considering also switching to a combined salary and per piece rate so as to motivate employees to be more efficient.

30. All of these plans were put on hold when I went to the U.S. - I am looking forwarding to visiting Pakistan in the near future so I can continue to press forward in this important endeavor with all the tremendous new knowledge I have gained since coming to the United States.

Exhibit 11.

15.  The motion also challenged the corresponding numerated portions of the USCIS's decision as follows:

1. The record showed that there was a qualifying relationship between the foreign entity and the petitioner inasmuch as Mr. Mansha was a 50% owner with equal right of control of the foreign entity, Shami Textiles, and owned 51% of AB Discount. Exhibit 10 at 1.

2. The record establishes that the beneficiary's role with the petitioner is qualifying inasmuch as it shows that he spends approximately 75% of his time supervising managerial or

supervisory personnel which is expressly defined in both the Immigration and Nationality Act and the Code of Federal Regulations as employment in a managerial capacity. Exhibit 10 at 2-4.

3. The record establishes that the beneficiary's role with Shami Textiles is qualifying inasmuch as it shows that he spends approximately 90% of his time supervising managerial or supervisory personnel which is expressly defined in both the Immigration and Nationality Act and the Code of Federal Regulations as employment in a managerial capacity.

Exhibit 10 at 4-6.

16. On April 19, 2018, the USCIS reconsidered its  decision, but, nevertheless, denied the petition again. Exhibit 12.

17. The decision failed to clearly state whether the USCIS was continuing to maintain that the U.S. company and the foreign entity lacked a qualifying relationship. While conceding that it had been wrong in denying that Mr. Ahmed controlled AB Discount, it nevertheless mused that:

> However, the statement from counsel includes a statement "as the partner she me textile, Mr. manchild was, as a matter of law, in charge "of its subject only to his partner zero". This statement indicates that the beneficiary, as managing partner of the foreign entity, may not control the entity. Regulations and case law indicate that ownership and control are important in establishing eval qualifying relationship".

Exhibit 12 at 2.

18. Ultimately, the decision failed to indicate whether it in fact had found that a qualifying relationship did not exist.

19. The decision also asserted that "the record does not establish that either the offered position with the petitioner or the beneficiary's previous position with the foreign entity were in a qualifying role in accordance with title eight, Code of Federal Regulations, part 204.5(j)(2)" *Id.*

20. The decision did not dispute that the beneficiary met each of the requirements of employment in a managerial capacity, but merely stated that "descriptions provided were not detailed enough to clearly show that the beneficiary's role with the petitioner is qualified", albeit not specifying what further details were required. *Id.* Likewise the decision did not dispute that the beneficiary met each of the statutory / regulatory criteria for being employed in a managerial capacity with Shami Textiles, but again merely stated that "the descriptions of the duties are not detailed enough to clearly indicate that the beneficiary's position with the foreign entity was in a qualified role." *Id.*

## CAUSES OF ACTION

22. 5 U.S.C. § 706(2) also provide that:

to the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--
**…**
(**2**) hold unlawful and set aside agency action, findings, and conclusions found to be--
(**A**) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
… .

23. As will be discussed below, the USCIS's decision in this matter may be not in accordance with law and is certainly arbitrary and capricious. Accordingly, it should be held unlawful and set aside.

## COUNT I

I. THE FINDING, IF THERE WAS ONE, THAT THE PETITIONER AND THE FOREIGN ENTITY LACKED A QUALIFYING RELATIONSHIP, WAS NOT IN ACCORDANCE WITH LAW.

24. While the USCIS's decision of February 7, 2018 was premised in part on the claim that the petitioner (AB Discount)  and the foreign entity (Shami Textiles) lacked a qualifying relationship, this was based upon the conclusion that Mansha, Inc. was the majority shareholder of AB Discount, a conclusion which the agency conceded was erroneous in its reconsidered decision of April 19, 2018. Exhibit 12 at 1-2. Nevertheless, the decision continued by stating that

> However, the statement from counsel includes a statement "as the partner of Shami Textiles, Mr. Mansha was, as a matter of law, in charge 'of it subject only to his partner's veto'. This statement indicates that the beneficiary, as managing partner of the foreign entity, may not control the entity. Regulations and case law indicate that ownership and control are important in establishing a valid qualifying relationship". Exhibit 12 at 2.

25. It is unclear whether the agency is making a finding here that the petitioner and the foreign entity lacked a qualifying relationship or if it is simply making generalized comments on the state of the law. In any event, if the decision was intended to hold that the petitioner and foreign entity lacked a qualifying relationship, that holding is not in accordance with law. The petitioner and the foreign entity have a qualifying relationship inasmuch as they are both affiliates.

26. The petitioner and the foreign entity are affiliates because they both meet the definition of subsidiary in that Mr. Mansha owns directly, 50% of Shami Textiles, which is a 50-50 joint venture with Faraz Ahmed, and has an equal controlling veto power over the entity with his partner. The agency does not appear to dispute that Mr. Mansha owns more than half of AB Discount and controls it as its managing member. Accordingly, to the extent that the agency's decision was premised upon a finding that the petitioner and the foreign entity lacked a qualifying relationship it is not in accordance with law.

COUNT II

THE FINDING THAT MR. MANSHA'S PROPOSED AND FOREIGN DUTIES
WERE NOT DETAILED ENOUGH IS ARBITRARY AND CAPRICIOUS IN
THAT IT WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE

27. The records shows that Mr. Mansha's former duties in Pakistan and proposed duties

in the U.S. meet squarely the requirements for qualifying as a multinational manager as set forth

in 8 C.F.R. § 204.5(j)(2). Mr. Mansha, as the Managing Member of AB Discount, and one of two

partners and the Managing Director of Shami Textiles, stands at the pinnacle of both

organizations. Exhibit 4 at 220 & 222. His duties, in both organizations, involve primarily

employment in a managerial capacity, in that in both organizations he spent or spends his time

performing duties expressly defined in the regulations as constituting employment in a

managerial capacity, such as supervising managers and supervisors. See Exhibit 4 at 217-218

(showing that Mr. Mansha spent 90% of his time at Shami Textiles supervising managers who in

turn supervised other employees, and therefore at the very least constituted supervisory

personnel) and Exhibit 12 at 2, not disputing that he "spends 56% of his time managing and

controlling the general manager of the petitioner".

28. In fact, aside from the suggestion that AB Discount might not have a qualifying

relationship with Shami Textiles, the only material[3] reason which the decision  offered for denial

was the bare assertion that Mr. Mansha's proposed duties with AB Discount and former duties

with Shami Textiles  were "not detailed enough" to show that they were "qualifying". Exhibit 12

---

[3] The decision did assert that Mr. Mansha's supervision of the supervisor of Mansha, Inc.
did not constitute an employment in a managerial capacity because Mansha, Inc. was supposedly
"not integral to the operation of the petitioner." Exhibit 12 at 2. This aspect of the decision is also
arbitrary and capricious in that it failed to take into account the fact that AB Discount and
Mansha, Inc. " will work closely with Shami Textiles, a Pakistan based manufacturer of clothing,
to expand Shami's highly successful clothing products to the American consumer, both directly
through AB Discount Depot's retail outlet and through other clothing retailers throughout the
United States." Exhibit 1 at 3. But inasmuch as the decision does not dispute that "spends 56% of
his time managing and controlling the general manager of the petitioner", Exhibit 12 at 2, nor
that he otherwise meets the criteria for being considered a multinational manager aside from his
job duties not being detailed enough or the possible affiliation issue, Mansha, Inc.'s relationship
to AB Discount is immaterial, inasmuch as the issues herein would be the same if Mansha, Inc.
didn't exist.

at 2. This despite the fact that AB Discount's opening description of Mr. Mansha's proposed

duties contained 680 words spread over three pages, Exhibit 2 at 3-5, and was supplemented by

Mr. Mansha's statement in response to the agency's request for evidence in which he offered

specific examples of 12 of the 16 enumerated duties he would perform at AB Discount.  Exhibit

7 at 1181-1183.  Further, the initial description of his duties provided by Shami Textiles in

support of the initial petition, Exhibit 4 at 217-218, is also 2 complete pages in length and

supplemented by a 2 page, 30 line sworn statement of Mr. Mansha in support of AB Discount's

motion to reopen and reconsider, in which he elaborated at length on his duties at Shami and

offered numerous concrete examples of exactly how those duties were performed.

29. The agency's bland repetition  that Mr. Mansha's job descriptions lack sufficient

detail is remarkable in light of how much more detail the petitioner actually  provides in

comparison to the government itself in describing similar positions.

30. For example, the Department of Labor's description of the duties of a Chief Executive

in the Standard Occupational Classification[4] contains 509 words, its Occupational Outlook

Handbook's description of the duties of a "Top Executive"[5] contains 353 words (not including

descriptions pertaining to public sector officers); and its Dictionary of Occupational Titles'

description of a company President[6] a mere 155 words. By contrast, the petitioner's descriptions

of the position offered Mr. Mansha, found at Exhibit 2 at 3-5 and Exhibit 7 at 1181-1183

(redundancies omitted), contain a combined total of 1202 words, while the combined description

of his job duties at Shami Textiles,  Exhibit 4 at 217-218 and Exhibit 11 at 1-2 (less

redundancies) contains 1236 words. Accordingly, depending upon which government job

description one is comparing it to, the petitioner's description of Mr. Mansha's duties are at least

---

[4] https://www.onetonline.org/link/summary/11-1011.00
[5] https://www.bls.gov/ooh/management/top-executives.htm
[6] https://occupationalinfo.org/18/189117026.html

more than twice and at most almost eight times more detailed than those of the government

itself.[7]

31. In fact, although the agency relies upon *Fedin Bros. Co., Ltd. v. Sava*, 724 F. Supp.

1103, 1108 (E.D.N. Y. 1989), affd, 905 F.2d 41 (2d. Cir. 1990), as authority for its claim that the

job duties here were insufficiently detailed, in fact the job descriptions here fully satisfies the

standards articulated in that decision. While in *Fedin* the agency complains that "(n)owhere is

there any description of how, when, where, and with whom these duties occurred. No specific

situations, circumstances or occurrences are mentioned", *Id*. at 1108, the job descriptions here

are rich with these very details.

32. For example, AB Discount explains how and with whom Mr. Mansha will perform

his duties as follows:

> He will oversee the action of the general manager in the sense that he will look to the
> general manager to be his resource in providing him the information needed to be able
> to perform the above tasks as well as providing the first draft of reports on each of these
> subjects, to which the Managing Member would make the final revisions and give
> final approval.

Exhibit 2 at 3.

33. "Where" is obviously 1514 Moffet Ave., Hewlett, NY, Exhibit 1 at 4, which is the

work location on his form I-140. Further, inasmuch as Mr. Mansha spends most of his time

working directly with his managers at AB Discount and Mansha Inc., "when" is when he meets

with those managers. Finally, far from failing to mention any "specific situations, circumstances

---

[7] AB Discount does not maintain that the mere quantity of words in its job descriptions is
sufficient to establish that they are "detailed enough" for multinational manager purposes.
However, in the complete absence of any explanation from the agency as to why Mr. Mansha's
job duties "are not detailed enough", it is useful to compare the length of its descriptions to
those of the government for the same category of position, bearing in mind that the government's
description are intended to cover a broad range of positions where as AB Discount's and Shami's
each cover only one. If anything then, one would expect the government's description to be
(much) longer than AB Discount's and Shami Textiles' if they were equally detailed.

or occurrences", Mr. Mansha in fact mentions 12 of them in the course of his job duties at AB

Discount. Exhibit 7 at 1181-1183.

34. Likewise, the petition did in fact describe how, when, where, and with whom Mr.

Mansha performed his  duties at Shami Textiles including specific situations, circumstances and

occurrences. For example, this is how the petition describes how Mr. Mansha, in his capactity as

Shami Textiles' Managing Director, performed those duties:

> The Managing Director and the GM (General Manager) meet daily to discuss the
> previous day's work, addressing issues that are ongoing or new, reviewing quantity of
> product produced, dealing with machine maintenance,  production schedules as they
> related to shipment dates, and exploring the possibility of hiring temporary workers.
>
> Printing Manager: The Managing Director meets daily with the Printing Manager to
> discuss issues regarding production. The topics include shipment dates, general
> production issues,creating, reviewing and analyzing samples new products to determine
> the feasibility of profitably mass producing them, and progress regarding new customers
> and quality control. They also  discuss efforts to find new products, new inks, and
> generally how to both increase the quality and reduce costs. The Managing Director and
> Printing Manager coordinate how best to communicatewith buyers, particularly if issues
> arise regarding price and/or quality. The Managing Director oversees the Printing
> Manager's interactions with buyers. The Managing Director also oversees
> the Printing Manager's progress if redo's are required after rejections from buyers. The
> meetings also focus on trouble-shooting in general and understanding why product was
> sent back.

Exhibit 4 at 217-218.

35. Mr. Mansha's letter continues in a similar vein to describe how he performed his

duties of overseeing the work of the Finance Manager, Administrative Manager and

Construction Manager. Exhibit 4 at 218.

36. Similarly, "where" these duties are performed is  obviously Shami Textiles' place of

business and when   for the most part, when he meets with one or more of his subordinate

managers.

37. Far from failing to mention any "specific situations, circumstances or occurrences", Mr. Mansha in fact provided in support of the motion to reconsider and reopen an extraordinarily detailed two page, 30 line, 885 word description of his day to day interactions with his managers in which he describes at length the various specific issues discussed with them and the hard management decisions which he struggled with in the course of his foreign employment. Exhibit 11 at 1-2.

38. The decision is completely devoid of any discussion whatsoever of why any of these descriptions of Mr. Mansha's duties are "not detailed enough". According to the agency, they just are, and that, apparently, is discussion enough.

39. Where an agency's factual findings are unsupported by substantial evidence then the decision based upon them is "arbitrary and capricious". *Lee v. Bd. of Governors of the Fed. Res. Sys.*, 118 F.3d 905, 914 (2d Cir. 1997) (citing *Association of Data Processing Serv. Orgs. v. Board of Governors*, 240 U.S. App. D.C. 301, 745 F.2d 677, 683 (D.C. Cir. 1984) (Scalia, J). The Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a  conclusion." *Am. Textile Mfrs. Inst. v. Donovan*, 452 U.S. 490, 522-23, 101 S. Ct. 2478, 2497 (1981*), quoting Universal Camera Corp. v. NLRB*,  340 U.S. 474, 477 (1951). Here not only is the descriptions provided of both Mr. Mansha's proposed duties in the U.S. and past duties in Pakistan between twice and eight times more extensive than those of the government itself for similar positions, and meets each of the standards set forth in *Fedin* for a sufficiently detailed job description for multinational manager purposes, but, further, no reasonable mind would accept as adequate to support a conclusion the evidence identified by the agency's decision as evidence that the job descriptions were "not detailed enough", which is exactly nothing beyond the agency's own unadorned assertions.

40. Accordingly, the agency's decision is arbitrary and capricious inasmuch as it is unsupported by substantial evidence, and should be held unlawful and set aside.

COUNT III

**THE MERE ASSERTION THAT MR. MANSHA'S PROPOSED AND PAST JOB DUTIES WERE "NOT DETAILED ENOUGH" TO BE "QUALIFYING" IS NOT AN ADEQUATE REASON TO FIND THAT HE WAS NOT, AND/OR WOULD NOT BE, EMPLOYED PRIMARILY IN A MANAGERIAL CAPACITY**

41. In order to withstand review under the arbitrary and capricious standard of the Administrative Procedure Act, the agency must "examine the relevant data and articulate a satisfactory explanation for its action." *Motor Vehicle Mfrs. Assn. of United States, Inc.* v. *State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983).

42. Here aside from a brief, uninformed and basically irrelevant discussion of whether AB Discount's marketing subsidiary should be considered a part of its organization, the agency has not in any way examined the relevant data presented by the petitioner, including approximately 6 pages of description of Mr. Mansha's duties with AB Discount and 4 with Shami Textiles.

43. Rather, the agency merely asserted that Mr. Mansha's proposed duties with AB Discount and former duties with Shami Textiles "were not detailed enough" to show that his duties were "qualifying". This is not an adequate reason  as to why Mr. Mansha was not, nor would be, employed primarily in a managerial capacity. *See Next Generation Tech., Inc. v. Johnson*, No. 15 cv 5663 (DF), 2017 U.S. Dist. LEXIS 165531, at *25-26 (S.D.N.Y. Sep. 29, 2017) (the contention that the beneficiary's duties "'were only generic job descriptions containing no specific information about the actual work Deo (the beneficiary) would be doing,'" is not  an "adequate reasons as to why the position description for the PIK PAC project… did not require 'theoretical and practical application of a body of highly specialized knowledge.'").

44. The failure of the agency to actually consider the evidence presented by AB Discount is particularly egregious in light of the extremely vague standard of "not detailed enough" which it has set as its sole criteria for judgement. Just as it is  "arbitrary and capricious for (an

administrative agency) to issue terms and conditions so vague as to preclude compliance therewith", *Ariz. Cattle Growers' Ass'n v. United States Fish & Wildlife*, *BLM*, 273 F.3d 1229, 1233 (9th Cir. 2001), so likewise it is arbitrary and capricious for the USCIS to adjudicate a request for benefits using a standard so vague as to also preclude compliance therewith – such as merely stating that the job duties were not detailed enough without indicating just what would be detailed enough duties.

45. Compare, for example, the agency's conclusory assertions that the description of Mr. Mansha's duties with AB Discount and Shami Textiles were insufficiently detailed with the criteria which the Court in *Ariz. Growers* found so vague as to preclude compliance with: "changes in a 22,000 acre allotment's 'ecological condition.'". How is merely saying that a job description "is not detailed enough" more informative than "changes in a 22,000 acre allotment's 'ecological condition.'"?

46. Further, as the 9th Circuit said, "Moreover, whether there has been compliance with this vague directive is within the unfettered discretion of the Fish and Wildlife Service, leaving no method by which the applicant or the agency can gauge their performance." Id. at 1250.

47. Likewise merely stating a job description is "not detailed enough" leaves no method by which AB Discount can determine if its job description was detailed enough. In fact, "not detailed enough" is a basically meaningless standard, since any description, no matter how detailed, can be characterized as "not detailed enough" in that there will always be at least some detail that could be added to any description, no matter how thorough. If Congress wanted to leave the approval of multinational managers to the "unfettered discretion" of the executive branch, it could do so, simply by specifying that their approval shall be in the Secretary of Homeland Security or Attorney General's discretion, as it has for many other requests for benefits, such as adjustment of status, 8 U.S.C. § 1255(a), or cancellation of removal, 8 U.S.C. § 1229b. That it did not is evidence that Congress did not wish to give USCIS unfettered discretion

to deny such petitions merely by saying they contained job descriptions which were "not detailed enough" without elaboration.

48. While the decision relies upon *Matter of Church of Scientology International*, 19 I&N Dec. 593, 604 (Comm. 1988),  in *Scientology*, the decision was primarily based upon an actual finding that the beneficiary's past and proposed duties were inconsistent with employment in a managerial capacity and not merely a blanket dismissal of them as not detailed enough. The agency noted that the beneficiary "'wrote programs which she implemented' to ensure that Church policy was followed regarding 'dissemination tours for Church expansion.' This appears to be the function of a staff officer or specialist not usually performed by a manager or executive." *Id.* at 604.

49. In fact the finding that the job description lacked sufficient detail was an after thought expressly identified in *Scientology* as *dicta*: "The record does not contain sufficiently detailed descriptions of the beneficiary's job duties, the job duties of her subordinates, and the organizational structures at her job sites to determine whether her employment is in a qualifying managerial or executive capacity. This issue was not raised in prior decisions. *As the petition is otherwise not approvable, it does not need to be addressed further. It is simply noted for the record*." *Id.* at 604 (emphasis added).

50. By contrast, here the agency has not identified any duty of the beneficiary not usually performed by a manager or executive. Nor would one expect it to be able to,  given that Mr. Mansha stands at the pinnacle of both the foreign and US organizations. Exhibit 4 at 220, 222.

51. Further, in *Scientology* it was noted that the beneficiary's current position with the petitioning US entity supervised only five other employees. *Id*. However, Mr. Mansha, as the person ultimately in charge of the entire U.S. organization, directly or indirectly supervises 10 people in the United States, including 2 supervisory employees, Exhibit 4 at 220, and, of course,

has the ultimate responsibility, with his partner, for at least 242 employees in Pakistan, Exhibit 7 at 36-37, including the 5 supervisory employees he directly supervises. Exhibit 4 at 217-218.

52. Finally, here, unlike in *Scientology*, the petitioner has provided the job duties of Mr. Mansha's subordinates and the organizational structure at its two jobsites. Exhibit 2 at 5, Exhibit 4 at 217-218.

54. In short, *Scientology* provides no support for the agency's decision here.

55. A decision which offers no material reason for denial other than that ten pages of job description provided by the petitioner of the beneficiary's proposed and foreign duties are "not detailed enough" is not one which has examined the relevant data and articulated a satisfactory explanation for its action. Accordingly it is arbitrary and capricious.

## CONCLUSION

The Court hold the defendant's decision unlawful inasmuch as it is not in accordance with law and/or arbitrary and capricious, and set it aside.

Respectfully Submitted

Michael E. Piston
Attorney for the Plaintiffs
Dated: